**MOUNTAIN FUEL SUPPLY COMPANY, a corporation, Plaintiff and Appellant,**

v.

**SALT LAKE CITY CORPORATION, a body corporate and politic under the laws of the State of Utah, Defendant and Respondent.**

No. 19886.

Supreme Court of Utah.

March 9, 1988.

20. *E.g., State v. Robbins,* 733 P.2d 132, 133 (Utah 1987) (per curiam).

Robert M. McDonald, D. Miles Holman, Salt Lake City, for plaintiff and appellant.

Roger F. Cutler, Salt Lake City, for defendant and respondent.

ZIMMERMAN, Justice:

Mountain Fuel Supply Company appeals from a grant of summary judgment upholding defendant Salt Lake City's utility licensing tax ordinances. Mountain Fuel argues that the measure unreasonably classifies those subject to its provisions and that the resulting tax discriminates unfairly against suppliers of certain energy sources, all in violation of equal protection principles contained in the state and federal constitutions and the Utah Code. In the alternative, Mountain Fuel argues that the measure is a sales or income tax that Salt Lake City ("the City") is not authorized to

levy. We reject these arguments and affirm the district court.

In 1977, Salt Lake City adopted a set of ordinances which impose an annual license tax on all suppliers of "telephone, gas or electric energy service." Initially, the tax was calculated as an amount equal to 6 percent of the suppliers' gross revenues from Salt Lake consumers, but it has since been reduced to 4 percent.[1]

Mountain Fuel is a public utility with a monopoly on the sale and delivery of natural gas in Salt Lake City. From 1978 to 1983, Mountain Fuel paid under protest $11,072,624.13 in license taxes due under the ordinances in question. The amount represented by these taxes was not borne by the company, but was passed directly through to Mountain Fuel's customers in Salt Lake City pursuant to rules and regulations of the Utah Public Service Commission. Beginning in 1979, Mountain Fuel brought ten separate suits, all later consolidated, seeking to have the city ordinances in question declared invalid and to obtain a refund of the taxes paid under protest. Mountain Fuel's challenge was two-pronged. It first alleged that the tax, although labeled an annual license tax, should more properly be characterized as a sales or income tax, which the City was not statutorily authorized to levy. A second

---

**1.** The ordinances were amended several times during the period covered by the ten cases consolidated here. At the time the last of the cases was filed in December of 1983, the ordinances read as follows:

*Section 20–3–14:* (1) There is hereby levied upon the business of every person or company engaged in business in Salt Lake City, Utah, of supplying telephone, gas or electric energy service as public utilities, an annual license tax equal to four percentum of the gross revenue derived from the sale and use of the services of said utilities delivered from and after July 1, 1980, within the corporate limits of Salt Lake City, said fee being in addition to the two percent franchise fee.

(2) Definitions:

(a) Gross revenue. "Gross revenue" as used herein, shall be construed to mean the revenue derived from the sale and use of public utility services within Salt Lake City, provided that "gross revenue" as applied to the telephone utility shall be construed to mean basic local exchange services revenue.

(b) Basic local exchange service revenue. "Basic local exchange service revenue" as used herein shall mean revenues received from the furnishing of telecommunications within Salt Lake City and access to the telecommunications network to either business, residential or other customers whether on a flat rate or measured basis, by means of an access line. Basic local exchange service revenues shall not include revenues obtained by the telephone public utility company from the provision of terminal telephone equipment services (such as basic telephone sets, private branch exchanges and key telephone systems), or from other telephone equipment which is obtainable from both the telephone company and other suppliers.

(c) Public utility services. "Public utility services" as used herein shall mean the sale and use of electric power and energy, natural gas and basic local exchange telephone service.

(3) Remittance Date. Within forty-five days after the end of each month in a calendar year, the public utility taxed hereunder shall file with the city treasurer of Salt Lake City a report of its gross revenue derived from the sale and use of public utility service in Salt Lake City as defined herein, together with a computation of the tax levied hereunder against the utility. Coincidental with the filing of such report, the utility shall pay to the city treasurer the amount of the tax due for that calendar month subject to said report.

*Section 20–3–14.1:* (1) There is hereby levied upon the business of every person or company engaged in the business in Salt Lake City, Utah, of supplying basic local exchange telephone service, as defined in Section 20–3–14 of the Revised Ordinances of Salt Lake City, Utah, natural gas or electric energy service in competition with public utilities, a[n] annual license tax equal to four percentum of the gross revenue derived from the sale and use of such competitive services sold, used or delivered within the corporate limits of Salt Lake City, after November 1, 1977.

(2) Definitions. In Competition With Public Utilities. "In competition with public utilities" shall mean to trade in products or services within the same market as a public utility taxed under section 14 of this chapter.

(3) Remuneration Date. Within forty-five days after the end of each month in a calendar year, any business taxed hereunder shall file with the city treasurer of Salt Lake City a report of its gross revenue derived from the sale and use of services specified hereunder rendered in competition with public utilities in Salt Lake City, together with a computation of the tax levied hereunder against such business. Coincidental with the filing of such report, the business shall pay to the city treasurer the amount of the tax due for the calendar month which is the subject of the said report.

contention was that the tax impermissibly discriminated between sellers of different sources of energy, in violation of the uniformity provisions of section 10–8–80 of the Utah Code and article I, section 24 of the Utah Constitution, as well as the equal protection clause of the federal constitution. U.S. Const. amend. XIV; Utah Const. art. I, § 24; Utah Code Ann. § 10–8–80 (1986).

The City defended by arguing that the tax cannot be viewed as an unauthorized sales or income tax, rather than a statutorily authorized license tax, simply because the amount of the tax is determined by the vendor's gross billings. It further asserted that the classification of those upon whom the tax was to be levied was proper and that the resulting discrimination between those energy suppliers taxed and those not taxed is permitted by relevant state and federal law. Finally, the City raised a res judicata defense, arguing that these identical issues had been decided against Mountain Fuel in *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, No. 192098 (Utah 3d Dist.1970). Both sides moved for summary judgment. In March of 1984, the trial court issued a memorandum decision granting summary judgment for the City. The court held that the tax was neither a sales tax nor an income tax and that the tax was not unreasonably discriminatory; it therefore found no reason to reach the res judicata issue.

■ On appeal, the positions of the parties are unchanged. Because this appeal presents only questions of law, we review the trial court's rulings for correctness and accord them no particular deference. *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985). We first consider Mountain Fuel's contention that the tax ordinances are impermissibly discriminatory in violation of equal protection principles embodied in state and federal law.

■ The essence of equal protection is that legislative classifications resulting in differing treatment for different persons must be based on actual differences that are reasonably related to the legitimate purposes of the legislation. *Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984). Mountain Fuel asserts that the City has acted arbitrarily in defining the class of businesses upon which the tax is imposed because it has treated differently those who are similarly situated with respect to the purposes of the tax. Specifically, Mountain Fuel contends that there is no legitimate justification for imposing the tax only on suppliers of natural gas and electricity and not on suppliers of alternative heating fuels such as coal, firewood, bottled gas, and fuel oil. Mountain Fuel contends that both groups of suppliers are in competition in the heating fuel market and that the City's failure to include the alternative fuel suppliers in the taxed class seriously distorts competition in that market.

Before considering the merits, it is appropriate to compare the standards to be applied in determining the validity of the ordinances under the uniform operation of the laws provisions in section 10–8–80 of the Code and article I, section 24 of the Utah Constitution with that applicable under the equal protection clause of the fourteenth amendment to the United States Constitution.

■ Section 10–8–80 of the Code empowers cities to levy licensing taxes so long as such "taxes shall be uniform in respect to the class upon which they are imposed." [2] Here, there is no question that the tax literally complies with this provision, because it is uniform with respect to all upon whom it is imposed. However, if that were all the provision meant, it would

---

**2.** [Cities] may raise revenue by levying and collecting a license fee or tax on any business within the limits of the city, and regulate the same by ordinance; provided, that no Utah city or town shall collect a license fee or tax hereunder from any solicitor or salesman who solicits, obtains orders for or sells goods in such city or town solely for resale; and no

enumeration of powers of cities contained in this chapter, shall be deemed to limit or restrict the general grant of authority hereby conferred. *All such license fees and taxes shall be uniform in respect to the class upon which they are imposed.*

Utah Code Ann. § 10–8–80 (1986) (emphasis added).

be tautological and purposeless. Therefore, we conclude that the word "class" must have been intended to refer to a group of persons or things with similar objective characteristics. Section 10–8–80, then, requires that we judge the uniformity of the City's legislative classification by examining the characteristics of the members of the class. *See Continental Bank & Trust v. Farmington City*, 599 P.2d 1242, 1245 (Utah 1979); *Salt Lake City v. Utah Light & Ry. Co.*, 45 Utah 50, 60–63, 142 P. 1067, 1070–71 (1914).

■ An identical concept is embodied in article I, section 24 of the Utah Constitution, which provides: "All laws of a general nature shall have uniform operation." *See Malan v. Lewis*, 693 P.2d at 670. To date, our cases have not recognized any distinction between the uniformity concepts embodied in the statute and the constitution. *See, e.g., Salt Lake City v. Utah Light & Ry. Co.*, 45 Utah at 60, 142 P. at 1070. We can discern no reason to read section 10–8–80 of the Code as imposing a more rigorous standard for reviewing the reasonableness of this license tax classification than the language of the constitution requires for reviewing any other type of legislation. *See* 2A N. Singer & C. Sands, *Sutherland Statutory Construction* § 45.11 (4th ed. 1984). Therefore, we conclude that if article I, section 24 is satisfied, so is the uniformity requirement of section 10–8–80.

The next question is the degree of congruence between the standard by which a classification is judged under article I, section 24 and that mandated by the equal protection clause of the fourteenth amendment to the federal constitution.

While the language of the state constitution requires "uniform operation" of the laws, the federal constitution speaks of "equal protection of the laws." *Compare* Utah Const. art. I, § 24 *with* U.S. Const.

amend. XIV, § 1. We have previously stated, "Although their language is dissimilar, these provisions embody the same general principle." *Malan v. Lewis*, 693 P.2d at 669. The basic concept of both provisions is the settled concern of the law that the legislature be restrained from the fundamentally unfair practice of creating classifications that result in different treatment being given persons who are, in fact, similarly situated, all of which redounds to the detriment of some of those so classified.

■ With respect to economic regulations which do not affect fundamental rights or discriminate on a suspect basis,[3] the standard of judicial review under the federal equal protection provision has been phrased as whether "the classification bears a rational relationship to an end of government which is not prohibited by the Constitution." Nowak, Rotunda & Young, *Constitutional Law* ch. 16, § I, at 591 (2d ed. 1983); *see, e.g., New York Rapid Transit Corp. v. New York*, 303 U.S. 573, 578, 58 S.Ct. 721, 724, 82 L.Ed. 1024 (1938) (utility excise tax reasonably related to object of the legislation). This Court has used nearly identical language in applying the uniform operation of the laws provision of the Utah Constitution, article I, section 24, *see, e.g., Baker v. Matheson*, 607 P.2d 233, 243–45 (Utah 1979), and has stated that in many circumstances the state and federal provisions are to be considered equivalent. *Id.* at 243 n. 4; *Liedtke v. Schettler*, 649 P.2d 80, 81 n. 1 (Utah 1982). And we have previously observed that when matters of economic regulation are involved, including tax measures, both federal and state constitutional provisions have been applied so as to give broad deference to legislative classifications. *Baker*, 607 P.2d at 244; *see Menlove v. Salt Lake County*, 18 Utah 2d 203, 209, 418 P.2d 227, 231 (1966); *State v. Taylor*, 541 P.2d 1124, 1125–26 (Utah 1975).

---

**3.** When legislative classifications affect fundamental liberties or involve suspect classes, the standard of review under the federal constitution is one of strict scrutiny requiring a showing of a compelling governmental interest. *See* L. Tribe, *American Constitutional Law* ch. 16, § 6 (1978). Although we have not expressly addressed the question under the state constitution, at least one judge has indicated that a strict scrutiny test would be appropriate under article I, section 24. *See Allen v. Trueman*, 100 Utah 36, 57–58, 110 P.2d 355, 365 (1941) (Wolfe, J., concurring).

However, having observed that equivalent language is used to state the test applied under the federal and state constitutional provisions does not end our inquiry. We must also look closely at how the tests have actually been applied. Such a review leads to the conclusion that the similarity in the stated standards under the two provisions does not amount to complete correspondence in application. In *Malan v. Lewis*, 693 P.2d at 670, we stated that even though the federal and state provisions embodied the same principle of equal treatment, they might well lead to different results in particular applications. Such differences in application are understandable because the state and federal courts may each follow different traditions in this area and implicitly or explicitly apply different standards in measuring the reasonableness of a classification. This Court has, in fact, developed a standard for reviewing legislative classifications under article I, section 24, which is at least as exacting and, in some circumstances, more rigorous than the standard applied under the federal constitution.

Since the mid–1930's, when the United States Supreme Court renounced the theory of substantive due process, federal courts have given extremely wide deference to economic regulations challenged on either due process or equal protection grounds.[4] *See* Garfield, *Privacy, Abortion, and Judicial Review: Haunted by the Ghost of Lochner*, 61 Wash.L.Rev. 293, 300–02 (1986). As commentators have noted, the Supreme Court has struck down only one state legislative effort at economic regulation since 1937, making federal constitutional review of such legislation "virtually a dead letter." Kirby, *Expansive Judicial Review of Economic Regulation under State Constitutions: The Case for Realism*, 48 Tenn.L.Rev. 241, 241 (1981); *see, e.g., Ferguson v. Skrupa*, 372 U.S. 726, 731–32, 83 S.Ct. 1028, 1031–32, 10 L.Ed.2d 93 (1963) (statute outlawing debt consolidation businesses not in violation of due pro-

cess); *McGowan v. Maryland*, 366 U.S. 420, 426–28, 81 S.Ct. 1101, 1105–06, 6 L.Ed. 2d 393 (1961) (Sunday closing law does not violate equal protection); *United States v. Carolene Products Co.*, 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938) (assumption that legislation affecting ordinary commercial transactions rests on rational basis).

State courts, on the other hand, have a long tradition, stretching back into the nineteenth century, of being far less willing to find that legislative classifications underlying economic regulations are reasonable. While state courts have been more deferential to legislative classifications at some times than at others, they have never abandoned their review function to the degree that the federal courts have since the mid–1930's. As a result, to pass state constitutional muster, a legislative measure must often meet a higher de facto standard of reasonableness than would be imposed by the federal courts. *See generally* Kirby, *Expansive Judicial Review of Economic Regulation Under State Constitutions: The Case for Realism*, 48 Tenn.L.Rev. at 251; *Developments in the Law: The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324, 1463 (1982); Galie, *State Supreme Courts, Judicial Federalism and the Other Constitutions*, 71 Judicature 100, 107–08 (Aug.–Sept. 1987).

Like many other state courts, this Court has been unwilling to abandon all scrutiny of economic regulation. In *State Tax Comm'n v. Department of Fin.*, 576 P.2d 1297 (Utah 1978), we reviewed a tax on the Worker's Compensation Insurance Fund and found that the discriminations it made between those similarly situated could not be justified under an equal protection analysis. In *Malan v. Lewis*, 693 P.2d 661 (Utah 1984), we applied article I, section 24 to strike down an automobile guest statute after an extensive analysis of how poorly the statute accomplished the legislative ob-

---

4. The federal due process and equal protection clauses are treated as substantively imposing the same standard of review. Thus, under either provision, economic regulations are tested un-

der the rational relationship rule. Nowak, Rotunda & Young, *Constitutional Law* ch. 16, § 1, at 585–86 (2d ed. 1983).

jectives. In *Weber Basin Homebuilders Ass'n v. Roy City,* 26 Utah 2d 215, 487 P.2d 866 (1971), we struck down a building permit fee ordinance which placed what was judged to be an unreasonably disproportionate burden on new homeowners. And we invalidated discriminatory Sunday closing laws in *Dodge Town, Inc. v. Romney,* 25 Utah 2d 267, 480 P.2d 461 (1971), and *Gronlund v. Salt Lake City,* 113 Utah 284, 194 P.2d 464 (1948). *Cf. Berry v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985) (products liability statute of repose struck down as violative of our open courts provision). These cases exemplify our approach to the review of economic regulations.

We do not purport today to settle definitively the question of the degree of congruence between the standards of review required by article I, section 24 and the federal equal protection clause. However, our past decisions and analogous rulings from other states demonstrate that in the area of economic regulation, the standard of scrutiny applied under article I, section 24 will always meet or exceed that mandated by the fourteenth amendment as it is presently being interpreted by the federal courts. Therefore, we need only determine whether the ordinances in question satisfy article I, section 24. If so, they will pass federal muster.

As noted above, the stated test to be applied under article I, section 24 is whether the classification of those subject to the legislation is a reasonable one and bears a reasonable relationship to the achievement of a legitimate legislative purpose. *See Malan v. Lewis,* 693 P.2d at 670. In responding to Mountain Fuel's argument that the City's utility license tax violates that standard, we first examine the reasonableness of the classification itself; we then assess the relationship between the classification and the legislative objective.

On its face, there is nothing obviously unreasonable about the classification. The tax applies to all suppliers of natural gas, electricity, and telephone service, whether or not they are public utilities. Treating these suppliers as a class is not in the abstract a discrimination "with no rational basis." *Mountain States Legal Found. v. Public Serv. Comm'n,* 636 P.2d 1047, 1055 (Utah 1981) (applying statute prohibiting preferential classification of utility customers). In addition, the basis on which the class is defined is not one that could be labeled impermissible, such as race.

Moving on to the reasonableness of the relationship of the classification to legitimate legislative objectives, the City advances two purposes for the ordinances which it contends are legitimate. The first is to raise revenue. The undisputed evidence shows that the license taxes collected from the gas, electricity, and telephone service suppliers covered by the ordinances, including Mountain Fuel, comprised approximately 20 percent of the City's total revenues during the period at issue. These revenues were used to provide police and fire protection, street maintenance, and other vital municipal services for all individuals and businesses in the city.

A second and related purpose claimed for the ordinance is that it advances the City's policy determination to raise revenue in such a fashion as to spread the tax-paying burden in a more fair and uniform manner than had previously been the case. The City has available only a few statutorily authorized means of raising revenue and relies heavily on the property tax. As the state capital, Salt Lake City houses many institutions that are exempt from property taxes because of their status as governmental, religious, or charitable organizations. *See, e.g., Utah County v. Intermountain Health Care, Inc.,* 709 P.2d 265 (Utah 1985); Utah Const. art. XIII, § 2. Yet these institutions receive all municipal services, including police and fire protection. The City has concluded that this state of affairs is inequitable. By imposing the licensing tax indirectly on all users of telephone, electric, and gas service, the City is able to reach those not otherwise subject to other City taxes and thereby spread more broadly the financial burden of providing City services. We conclude that both declared purposes of the ordi-

nances are plainly legitimate governmental objectives.

The next question is whether the City chose a permissible means to achieve its legitimate ends. Mountain Fuel's main contention is that the license tax is not a reasonable means of attaining those objectives because it unjustifiably imposes a substantial competitive burden on gas and electricity suppliers without imposing comparable burdens on similarly situated suppliers of firewood, coal, and other alternative heating fuels. We cannot agree.

First, even considering the record facts in a light most favorable to Mountain Fuel,[5] we cannot say that the tax unduly burdens suppliers of gas and electricity as sources of energy for heating. The undisputed evidence is that the rate of Mountain Fuel's return on its investment is set by the Public Service Commission[6] and that even though the tax is passed directly through to consumers, the overwhelming majority of heating fuel consumers have continued to rely on natural gas or electricity rather than switching to any of the competing alternative fuels. It is also evident that Mountain Fuel encounters relatively little administrative cost in collecting the tax because it already has in place a system for collecting other taxes from its customers.

Second, the City's undisputed evidence shows that it would be economically inefficient and administratively cumbersome to track down every supplier of firewood, coal, or bottled gas sold for use within the city and attempt to collect from each such supplier a tax based on revenues earned from customers within the city. This evidence is sufficient to justify the City's decision not to include small-scale fuel suppliers in the taxed class. The City is not to be denied the most effective means of raising needed revenues unless that means imposes an unreasonable burden on the affected parties. *See Thompson v. Salt Lake City Corp.,* 724 P.2d 958, 959 (Utah 1986). We agree with the court below that as a matter of law, the City has chosen a reasonable means to achieve legitimate legislative ends. Mountain Fuel's challenge to the ordinances under the uniformity provisions of the Utah Code and Utah Constitution and under the equal protection clause of the federal fourteenth amendment is therefore rejected.

Mountain Fuel makes another argument: that the tax should be characterized as an income or sales tax. There is no reason to give extended treatment to this claim; it is without merit. And our disposition of the other points makes it unnecessary to reach the City's res judicata argument.

The grant of summary judgment for Salt Lake City is affirmed. Costs are awarded to Salt Lake City.

HALL, C.J., STEWART, Associate C.J., and DURHAM, J., concur.

HOWE, Justice (concurring):

While I concur in much of the majority opinion, I rest my concurrence on our decision in *Mountain States Tel. & Tel. Co. v. Ogden City,* 26 Utah 2d 190, 487 P.2d 849 (1971), a case not cited by the majority, where we held that for purposes of taxation a telephone company, a gas company, and a power company, which are monopolies regulated by the Utah Public Service Commission, comprise a distinct class of businesses within the public utility field. We concluded that an ordinance which was substantially similar to the ordinance in question in the instant case was reasonable and not discriminatory. *See also Mountain States Tel. & Tel. Co. v. Salt Lake City,* 596 P.2d 649 (Utah 1979). These cases are in accord with solid precedential authority of the United States Supreme Court in taxation cases, such as *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (upholding a provision of the Illinois Constitution which exempts from personal property taxes all personal property owned by individuals but retains such taxes as to

---

5. In reviewing a grant of summary judgment, we construe the facts in favor of the party opposing the motion. *Payne v. Myers,* 743 P.2d 186, 187–88 (Utah 1987).

6. *See Utah Dep't of Business Regulation v. Public Serv. Comm'n,* 720 P.2d 420, 420–22 (Utah 1986).

personal property owned by corporations or other "non-individuals"); *New York Rapid Transit Corp. v. City of New York,* 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024 (1938) (upholding an ordinance levying an excise tax on every utility but not on other business units); and *Heisler v. Thomas Colliery Co.,* 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237 (1922) (upholding a statute taxing anthracite coal but not bituminous coal).

As to the complaint of the plaintiff that the ordinance in question does not tax other suppliers of fuel such as coal and wood which compete with the plaintiff, those suppliers do not escape taxation. They, too, are subject to the license tax of Salt Lake City, but they are classified and taxed differently from public utility monopolies.